COURT OF APPEALS
DECISION
DATED AND FILED

March 27, 2025

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2023AP2322**

STATE OF WISCONSIN

Cir. Ct. No. 2021CV2993

IN COURT OF APPEALS
DISTRICT IV

---

JT PROPERTIES OF MT HOREB, LLC,

    PLAINTIFF-APPELLANT,

  V.

AMERICAN TRANSMISSION COMPANY LLC,
ATC MANAGEMENT INC., AND DAIRYLAND
POWER COOPERATIVE,

    DEFENDANTS-RESPONDENTS.

---

APPEAL from a judgment of the circuit court for Dane County: STEPHEN E. EHLKE, Judge. *Affirmed.*

Before Blanchard, Graham, and Taylor, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. JT Properties of Mt Horeb, LLC ("JT Properties") appeals a judgment dismissing its challenge to American Transmission Company LLC, ATC Management, Inc., and Dairyland Power Cooperative (collectively, "ATC") taking a high voltage transmission line easement on a portion of JT Properties' land ("the Easement"). JT Properties argued that ATC's taking of the Easement for this purpose rendered the remaining portion of JT Properties' land an "uneconomic remnant," as that term is defined in WIS. STAT. § 32.06(3m) (2023-24), and constituted an unnecessary taking because ATC took more rights than was necessary to accomplish the public purpose of providing electricity.[1] Following pre-trial briefing, a three-day court trial, and post-trial briefing, the circuit court issued an oral ruling that rejected these claims. It determined that the taking of the Easement did not render the remainder of JT Properties' land an uneconomic remnant and that the taking of the Easement was reasonably necessary for the public purpose of providing electricity.[2] The court thereafter entered an Order for Judgment and Judgment dismissing JT Properties' complaint. JT Properties appeals.

¶2 On appeal, JT Properties argues that the circuit court incorrectly applied the law in its uneconomic remnant determination because the court assumed that ATC would not exercise all of the rights that it had taken rather than

---

[1] All references to the Wisconsin Statutes are to the 2023-24 version unless otherwise noted.

[2] JT Properties' complaint also raised the following claims: (1) ATC's hazard tree rights granted in the Easement violated the statutory prohibition in WIS. STAT. § 182.017(7)(h); (2) other cases not involving JT Properties had nullified ATC's right to acquire the Easement; and (3) ATC violated JT Properties' Fourteenth Amendment rights as protected by the United States Constitution. The circuit court granted partial summary judgment in favor of ATC on these claims, which JT Properties does not challenge on appeal.

assuming that ATC will exercise all of the rights set forth in the Easement. In the alternative, JT Properties renews its argument that ATC's jurisdictional offer is void because ATC took more rights than were necessary to accomplish the public purpose of providing electricity. We reject these arguments because they are premised on erroneous interpretations of the Easement language. Accordingly, we affirm.

## BACKGROUND

¶3    There is no dispute about the following material facts.

¶4    In 2005 and 2006, respectively, JT Properties purchased two adjacent lots, referred to as Lot 10 and Lot 9, in Blue Mounds, Wisconsin, abutting U.S. Highway 18/151 ("the Property"). The Property, which totaled approximately five acres, required extensive excavation work to prepare it as a commercial building site.

¶5    After the majority of the Property was excavated and graded, John Theobald, the owner of JT Properties, constructed a 12,348-square-foot "shop building" on Lot 10, out of which he runs his family's glass and mirror business, Mount Horeb Glass. Theobald also resides in a portion of the shop building and rents out other commercial spaces in the building. At its highest point, the shop building is 28 feet tall. In 2015, on the adjacent Lot 9, Theobald built four storage buildings that contain 81 storage units that he rents out. The northernmost storage building is a large "contractor unit" building that, at its highest point, is 23 feet tall. All five buildings were constructed on the graded portion of the Property that is approximately 25 feet lower than the elevation of the highway. A rock wall separates the graded portion of the Property from a small portion of the northern edge of the Property that is parallel to and at the same elevation as the highway.

3

The Property also contains a large gravel pile that sits on the graded portion of the Property and that has a maximum height slightly higher than the rock wall.

¶6      In 2019, the Wisconsin Public Service Commission ("PSC") approved the Cardinal-Hickory Creek high voltage electricity transmission line project.  The purpose of the project is to improve the reliability of electrical service, to provide economic benefits to Wisconsin electricity customers, and to increase the percentage of electricity on the market that is generated by clean and renewable sources.

¶7      As part of the Cardinal-Hickory Creek Transmission Line Project, ATC sought to acquire the Easement for the construction of a high-voltage transmission line on a portion of the Property.  In November 2021, after negotiations between the parties failed, ATC sent JT Properties a jurisdictional offer for the taking of the Easement.[3]  Attached to the jurisdictional offer was the Easement document, which grants ATC a "perpetual right and easement to construct, install, operate, maintain, repair, replace, rebuild, remove, relocate, inspect and patrol" a high-voltage electric transmission line and related equipment "upon, in, over and across property owned by the Landowner."  Specifically, the Easement allows ATC to construct, operate, and maintain a double-circuit transmission line with a 345-kilovolt (kV) circuit and a 138-kV circuit strung between a single pole that is up to 191 feet tall in the northeast corner of the

---

[3] One definition of "easement" adopted by Wisconsin courts is "a right or privilege to use land belonging to another, often for a specific purpose." *Hanson Revocable Tr. v. American Transmission Co.*, 2024 WI App 55, ¶78, 413 Wis. 2d 686, 12 N.W.3d 867 (emphasis omitted); *see also* **Grygiel v. Monches Fish & Game Club, Inc.**, 2010 WI 93, ¶13, 328 Wis. 2d 436, 787 N.W.2d 6 ("An easement is a liberty, a privilege, or an advantage in lands" that is "distinct from [the] ownership [of the land].").

4

Property and other poles outside of the Property. The conductors of the 345-kV circuit consist of three upper electrical wires and the conductors of the 138-kV circuit consist of three lower wires. The Easement specifies the minimum height of the wires as follows: "[m]inimum height above existing landscape (ground level): 20.7 feet." (Emphasis omitted.)

¶8    The Easement delineates the boundaries of a 1.66-acre strip of land, totaling 877 feet in length and 91 feet in width, which we refer to as the "Easement property," upon which ATC is granted the right to construct and maintain the high voltage electricity transmission line. Attached to the Easement are exhibits that detail the other obligations of ATC in constructing and maintaining the transmission line as well as "Easement Description Maps." These maps show that the northern 22 feet of the shop building on Lot 10 and the entire "contractor unit" storage building on Lot 9 are within the Easement property.

¶9    After receiving the jurisdictional offer, JT Properties timely commenced an action in the Dane County Circuit Court under WIS. STAT. § 32.06(5) challenging ATC's right to take the Easement. In pertinent part, JT Properties claimed that ATC's taking of the Easement would cause the remaining portions of the Property to be an "uneconomic remnant" under § 32.06(3m). The term "uneconomic remnant" is defined as "the property remaining after a partial taking of property, if the property remaining is of such size, shape, or condition as to be of little value or of substantially impaired economic viability." Sec. 32.06(3m)(a). JT Properties alleged that, because its remaining property would be of little or substantially impaired economic value due to the existence, nature, and terms of the Easement, ATC must offer to take or purchase the entire Property. In its complaint, JT Properties also "reserved the right" to challenge the jurisdictional offer on other grounds, including that "ATC improperly state[d] the

extent of the interests needed." In its pre-trial briefing, ATC apparently referred to this extent-of-interests-needed concept for the first time when it contended that:

> ATC may attempt to argue that it is not going to use all of the rights that it has acquired under the easement, however in the event that ATC makes this argument, we will ask the Court to declare the easement void. This is because if ATC were to take more rights under the easement than it actually needed, the taking would be void because a condemning authority is prohibited from taking more than it needs for the public use.

¶10    At trial, both parties presented evidence regarding the value of the Property before and after the taking. ATC presented the testimony of an appraiser, while JT Properties presented the testimony of both an appraiser and of Theobald. ATC's appraiser testified that the Property lost relatively little value after the taking, decreasing from approximately $2.5 million to approximately $2.4 million. By contrast, JT Properties' appraiser testified that the Property lost a significant amount of value after the taking, decreasing from approximately $3 million to around $600,000. Theobald testified that the loss of value was even more significant, decreasing from approximately $3.5 million to just under $500,000. Both Theobald's and JT Properties' appraiser's opinions of the value of the Property after the taking were based on an assumption that the Easement granted ATC the right to hang electrical wires at 20.7 feet above the graded portion of the Easement property and the right to remove the existing buildings within the Easement property.

¶11    Additionally, both parties presented testimony of electrical safety experts regarding JT Properties' ability to safely use the Property after the construction of the transmission line. ATC's representative also testified about the design of the transmission line, explaining that the lowest point at which the electrical wires would ever hang above the graded portion of the Easement

property was 60.5 feet because ATC's "design standard" was to measure the minimum 20.7-foot clearance from the highest point in the landscape of the Easement, with additional clearance as a "buffer."

¶12    After the trial, each party submitted post-trial briefs. JT Properties expanded on the allegation that ATC took more property than was necessary for the public purpose of providing electricity, contending in relevant part that it was not necessary for ATC to take the following:  the right to hang the electrical wires as low as 20.7 feet above the graded portion of the Easement property or the right to enter the buildings within the Easement property.[4]

¶13    The circuit court concluded in an oral ruling that the Easement did not render the remaining portion of the Property an uneconomic remnant.  The court did not determine the exact value of the Property before the taking, finding that all the witnesses agreed that the Property was worth "several million dollars." As to the value of the Property after the taking, the court found that ATC's appraiser had "the better and more credible estimate" because the Property could continue to be used exactly as it had been used.  The court determined that the evidence established that the buildings and businesses operating on the Easement property were not affected by the transmission line "in any meaningful way" and that the businesses could continue to operate safely on the Property with the transmission line in place.  Additionally, the court rejected JT Properties' argument that the Easement is void for taking more rights than was necessary.

---

[4] JT Properties also argued in its post-trial brief that it was not necessary for ATC to take the right to hang electrical wires lower than they are currently constructed, the right to remove two trees from the Easement area, and the right to assign the Easement to other parties.  JT Properties does not renew these arguments on appeal.

The court determined, in pertinent part, that the PSC had approved the Cardinal-Hickory Creek Project, that the Easement was a reasonable taking in light of its purpose, and that the 20.7-foot clearance specification was not unreasonable because it is the minimum height for hanging electrical wires allowed by the state electrical code. JT Properties appeals.

## DISCUSSION

¶14    As stated, JT Properties argues on appeal that the circuit court erred in rejecting its uneconomic remnant argument because the court relied on evidence that ATC would not exercise all of the rights set forth in the Easement rather than assuming that ATC would exercise the full extent of the rights granted. In the alternative, JT Properties argues that ATC's jurisdictional offer is void because it takes more rights than are necessary to accomplish the public purpose of providing electricity. For the following reasons, we reject JT Properties' arguments and affirm.

### I.  Uneconomic Remnant

¶15    JT Properties argues that the circuit court erred in its rejection of JT Properties' uneconomic remnant claim because the court failed to consider three potential "most injurious" uses of the Property allowed by the Easement: (1) ATC could hang electrical wires as low as 20.7 feet above the graded portion of the Easement property; (2) ATC could demand the removal of the existing buildings on the Easement property; and (3) ATC could enter the existing buildings on the Easement property. As we understand it, JT Properties contends that any of these outcomes could render the remaining portion of the Property "of little value or of substantially impaired economic viability." *See* WIS. STAT. § 32.06(3m)(a). We

8

begin by setting forth the principles governing condemnation proceedings and uneconomic remnant claims.

## A.  Legal Principles and Standard of Review

¶16    When, as here, a utility such as ATC seeks to take property via eminent domain to build a high voltage electricity transmission line, it must follow the condemnation procedures outlined in WIS. STAT. § 32.06.  *Waller v. American Transmission Co.*, 2013 WI 77, ¶59, 350 Wis. 2d 242, 833 N.W.2d 764.  Most condemnations under § 32.06 require a determination of the "necessity of the taking."  Sec. 32.06(1).  As relevant here, ATC obtained a certification of public convenience and necessity under WIS. STAT. § 196.491(3) from the PSC.  *See* WIS. STAT. § 32.07(1).

¶17    The utility must then attempt to negotiate an agreement with the landowner for the purchase of the property sought to be condemned.  WIS. STAT. § 32.06(2a).  If the negotiations are unsuccessful, as they were here, the utility must then "make and serve" a jurisdictional offer to the landowner that describes, among other things, the property to be taken and the amount of compensation to be given.  Sec. 32.06(3) (requiring that jurisdictional offers comply with WIS. STAT. § 32.05(3)).  If the landowner wishes to contest "the right of the condemnor to condemn the property described in the jurisdictional offer for any reason other than that the amount of compensation offered is inadequate," the landowner must commence an action within forty days of receiving the jurisdictional offer. Sec. 32.06(5).  A landowner's challenge under § 32.06(5) is commonly referred to as a "right-to-take" action, which is the type of action that JT Properties initiated

in the circuit court. ***Hanson Revocable Tr. v. American Transmission Co.***, 2024 WI App 55, ¶19, 413 Wis. 2d 686, 12 N.W.3d 867.[5]

¶18    Commencing a right-to-take action is a property owner's only option to allege that a taking will leave the property owner with an "uneconomic remnant." ***Waller***, 350 Wis. 2d 242, ¶6. As noted, a property owner is left with an uneconomic remnant when the property remaining after a partial taking is "of such size, shape, or condition as to be of little value or of substantially impaired economic viability." WIS. STAT. § 32.06(3m)(a).

¶19    Whether the remaining property after a partial taking has been rendered an uneconomic remnant is a factual question for the circuit court to resolve. ***Waller***, 350 Wis. 2d 242, ¶101. We will uphold the circuit court's factual findings, including its credibility determinations, unless they are clearly erroneous. ***Id.***, ¶52; *see also* ***Lessor v. Wangelin***, 221 Wis. 2d 659, 665-66, 586 N.W.2d 1 (Ct. App. 1998) ("When a trial court makes findings of fact as to the credibility of witnesses, we will not upset those findings unless they are clearly erroneous."). Whether the court applied the correct legal standard to the facts is a question of

---

[5] If the landowner does not timely accept the jurisdictional offer, the condemnor may also initiate condemnation proceedings in the circuit court in the county where the property is located to determine the necessity of the taking, if such a determination is required, and the amount of just compensation owed the property owner as a result of the taking. WIS. STAT. § 32.06(7). This type of proceeding has been referred to as a "condemnation-and-valuation" proceeding. ***Hanson Revocable Tr.***, 413 Wis. 2d 686, ¶19. Right-to-take actions and condemnation-and-valuation actions may proceed simultaneously. Sec. 32.06(5) ("The commencement of an action by an owner under this subsection shall not prevent a condemnor from filing the petition provided for in sub. (7) and proceeding thereon."); *see also* ***Waller v. American Transmission Co.***, 2013 WI 77, ¶68, 350 Wis. 2d 242, 833 N.W.2d 764 (right-to-take and condemnation-and-valuation proceedings may proceed simultaneously). Here, we take judicial notice, according to Wisconsin's Consolidated Court Automation Programs, that condemnation-and-valuation proceedings remain pending in a separate action in the Dane County Circuit Court. *See* WIS. STAT. § 902.01; ***Kirk v. Credit Acceptance Corp.***, 2013 WI App 32, ¶5 n.1, 346 Wis. 2d 635, 829 N.W.2d 522.

law that we review de novo. *Jacobson v. American Tool Cos.*, 222 Wis. 2d 384, 393, 588 N.W.2d 67 (Ct. App. 1998).

¶20 In determining the value or economic viability of the remaining property after a partial taking, the factfinder—here, the circuit court—must consider the extent of the property and the property interests that are being taken. *See Waller*, 350 Wis. 2d, ¶¶96-100; *see also Island Camping, Inc. v. DOT*, No. 2019AP2284, unpublished slip op. ¶78 (WI App July 1, 2021) ("[A]n uneconomic remnant determination [must] be based only on effects of the partial taking that remain after the partial taking is completed and that such effects will continue to adversely affect the condition of the property and its uneconomic viability in the future."). The parties do not dispute that, in determining the value or economic viability of the remaining property, the court must assume that "the condemnor … will exercise all the rights that it has taken" and must consider "the most injurious use of the property reasonably possible." *Savage v. American Transmission Co.*, 2013 WI App 20, ¶16, 346 Wis. 2d 130, 828 N.W.2d 244.

¶21 The extent of the taking depends on the language of the jurisdictional offer. *See* WIS. STAT. § 32.06(3) (requiring the jurisdictional offer to comply with WIS. STAT. § 32.05(3), which in turn requires the jurisdictional offer to describe "the property and the interest therein sought to be taken"). Here, the extent of ATC's taking is set forth in the Easement attached to ATC's jurisdictional offer, so we must interpret the language of the Easement. When interpreting an easement acquired by eminent domain, as with other types of easements, our goal is to ascertain the intent of the easement. *Czarnik v. Sampson Enters., Inc.*, 46 Wis. 2d 541, 548, 175 N.W.2d 487 (1970); *see also* 3 NICHOLS ON EMINENT DOMAIN, § 9.02[7][b][ii] (rev. 3d ed. 2025) ("The court must determine the intent, express or implied, of the condemnation decree awarding the

11

interest."). The primary source of intent is the language of the easement itself. *Rikkers v. Ryan*, 76 Wis. 2d 185, 188, 251 N.W.2d 25 (1977). If the language of the easement is unambiguous—*i.e.*, that it is susceptible to only one reasonable meaning—then we interpret it according to that meaning. *Garza v. American Transmission Co.*, 2017 WI 35, ¶25, 374 Wis. 2d 555, 893 N.W.2d 1. However, if the language of the easement is uncertain, indefinite, or ambiguous, "[b]ecause eminent domain involves the element of compulsion, [the] construction must be adopted which … leaves the owner with the greatest possible estate." *Czarnik*, 46 Wis. 2d at 547. In other words, if the language of the easement is ambiguous, we do not resort to extrinsic evidence to determine intent but instead construe that ambiguity in the way that preserves the most property possible for the landowner. *Id.* The interpretation of an unambiguous easement and the threshold question of whether the easement is ambiguous both present questions of law that we review independently. *AKG Real Est., LLC v. Kosterman*, 2006 WI 106, ¶14, 296 Wis. 2d 1, 717 N.W.2d 835.

¶22    We now apply these condemnation principles to JT Properties' uneconomic remnant claims.

### B.  20.7-Foot Minimum Height of the Electrical Wires

¶23    JT Properties argues that the circuit court erroneously determined that the Easement did not render the remaining property an uneconomic remnant because the court failed to consider that the Easement grants ATC the right to hang electrical wires as low as 20.7 feet above the graded portion of the Easement property. According to JT Properties, if ATC hung the wires 20.7 feet above the graded portion of the Easement property, which is what JT Properties argues the Easement allows, the wires would so significantly interfere with the continued use

of a portion of the 28-foot-tall shop building and the entire 23-foot-tall "contractor unit" storage building that these buildings would need to be removed. For the following reasons, we conclude that the Easement does not grant ATC the right to hang wires at 20.7 feet above the graded portion of the Easement property.

¶24    As noted, the Easement sets forth the following specification about the height of the electrical wires: "Minimum height above existing landscape (ground level): 20.7 feet."[6] (Emphasis omitted.) However, the ground underneath the transmission line consists of both the rock wall and the graded portion of the Property on which the buildings sit, approximately 25 feet lower than the top of the rock wall. The wires are to hang roughly above the path of the rock wall but also partially overhang the graded portion of the Easement property. There is also a large gravel pile underneath the transmission line that is slightly higher than the portion of the Easement property atop the rock wall.

¶25    Given the uneven topography of the Easement property, the phrase "[m]inimum height above existing landscape (ground level)" could have at least two reasonable meanings. On the one hand, this phrase could be reasonably interpreted as requiring that the 20.7-foot minimum clearance height of the electrical wires be measured from the highest point in the landscape, which could be considered the "ground level" for purposes of calculating the minimum clearance required. Under this interpretation, the height of the wires would be

---

[6] We note that ATC was statutorily required to specify in the Easement "the minimum height of the transmission lines above the landscape" and the "length and width of the right-of-way." WIS. STAT. § 182.017(7)(a). The parties do not dispute that 20.7 feet is the minimum height from the "ground" that the electrical wires may be hung as allowed under the Wisconsin State Electrical Code, WIS. ADMIN. CODE ch. PSC 114 (Dec. 2024). The code does not define "ground." All subsequent references to WIS. ADMIN. CODE ch. PSC 114 are to the December 2024 register date unless otherwise noted.

13

measured from the top of the gravel pile, which, as ATC's witness testified at trial, is how the transmission line was designed and how the wires are currently constructed on the Easement property.[7]  This interpretation is also supported by the provisions of the Wisconsin State Electrical Code from which the 20.7-foot minimum clearance height for wires is derived.  Specifically, the Wisconsin State Electrical Code provides that "all clearances shall be measured from surface to surface."  NAT'L ELEC. SAFETY CODE § 230A3 (INST. ELEC. & ELEC. ENG'RS 2017); WIS. ADMIN. CODE § PSC 114.230.[8]  This rule indicates that the minimum

---

[7] Specifically, ATC's representative testified as follows about the minimum height of the electrical wires:

> So the 20.7 feet referenced in the easement is out of Wisconsin electric code.  That is the minimum requirement.  ATC, as part of our design, always exceed[s] the minimum requirements.  So we've got buffers we add on … top of the 20.7 feet.  But when we're doing our clearance and [ATC's] engineering [department] is doing their calculations, they're looking at the highest point within the right-of-way corridor.  And as we talked about earlier looking at the plan and profile, that appeared to be the gravel pile.
>
> ….
>
> ATC takes the code requirement, [and follows] our design standards, so we never design to meet or have a conductor at 20.7 feet.  We always exceed that.  And when looking at our design standard clearances, we always go to the highest point within the right-of-way.  The entire 150[-]foot[-]wide right-of-way corridor that I explained earlier, we look at the highest point in there.  It could be a building, it could be a sign, it could be a gravel pile, whatever the highest point is, that's where we start the design from and go up.

[8] The Wisconsin State Electrical Code adopts the 2017 edition of the National Electrical Safety Code (NESC) by reference, with certain deletions, changes, and additions.  WIS. ADMIN. CODE § 114.001(3).  The rule that clearances must be measured from "surface to surface" is set forth in NESC Rule 230A3, which was adopted by WIS. ADMIN. CODE § PSC 114.230.

14

clearance must be measured from the nearest "surface" to the wire, which, in this case, would be the highest point in the Easement property.

¶26    On the other hand, the phrase "height above the landscape (ground level)" could be reasonably interpreted as referring to the lowest point in the landscape—*i.e.*, the surface of the graded portion of the Easement property. Under this interpretation, the Easement would grant ATC the right to hang electrical wires at a height above the graded portion of the Easement property such that the wires could come into contact with a portion of the existing 28-foot-tall shop building and the entirety of the 23-foot-tall "contractor unit" storage building.

¶27    Because there are at least two reasonable interpretations of the Easement's language concerning the minimum height of the electrical wires, we conclude that this language is ambiguous.  Accordingly, we must construe this language to leave JT Properties with the greatest possible estate, *see Czarnik*, 46 Wis. 2d at 547, which, in this case, means that we must construe the Easement as granting the right to hang wires no lower than 20.7 feet above the highest point in the landscape of the Easement property.  In other words, under our interpretation of the Easement, ATC does not have the right to hang wires as low as 20.7 feet above the lowest point of the Easement property—*i.e.*, the graded portion of the Easement property—and instead must calculate the 20.7 feet of clearance from the highest point on the Easement property.  JT Properties makes no argument on appeal that, under this interpretation of the Easement, an uneconomic remnant results.  Accordingly, we conclude that the circuit court did not err in rejecting JT Properties' argument that an uneconomic remnant was created by the Easement in allowing the wires to hang 20.7 feet above the graded portion of the Easement property.

### C. Removal of the Existing Buildings

¶28    JT Properties separately argues that the circuit court erred in rejecting its uneconomic remnant argument because the court failed to consider that the Easement grants ATC the right to remove the existing buildings on the Easement property.  In support, JT Properties relies on the following language in the Easement:  "It is understood and agreed that the Landowner shall have the right to use and maintain the present existing buildings and signs within the [Easement property] *subject to the Grantee's rights and the terms and conditions applicable to the Landowner's use of the [Easement property]*."  (Emphasis added.)  For the following reasons, we conclude that this language does not grant ATC the right to remove the existing buildings located on the Easement property.

¶29    First, the Easement clearly reserves to JT Properties the right to use and maintain the existing buildings on the Easement property.  Specifically, the Easement states that:  JT Properties "shall have the right to use and maintain the present existing buildings and signs within the [Easement property]"; JT Properties "has the right to repair and/or replace the existing buildings and signs within its present boundaries in the event of destruction, damage or deterioration"; and ATC "shall pay a reasonable sum for damages to the buildings and signs caused by the construction, installation, operation, maintenance, repair, replacement, rebuilding, removing, relocation, inspection, or patrolling of said Electric Transmission Facilities."  By expressly reserving to JT Properties the right to continue using and maintaining the buildings, these provisions demonstrate that the Easement does not allow ATC to remove the existing buildings.

¶30    Second, the clause "subject to the Grantee's rights and the terms and conditions applicable to the Landowner's use of the [Easement property]" does not

allow ATC to remove the buildings. As with any other language, this clause must be interpreted in the context of the entire Easement. *Garza*, 374 Wis. 2d 555, ¶¶36, 38. We begin by analyzing the first part of this clause.

¶31 The first part of this clause—"subject to the Grantee's rights"— refers to the rights specifically granted to ATC by the Easement. For example, the Easement grants ATC the right to "construct, install, operate, maintain, repair, replace, rebuild, remove, relocate, inspect and patrol" the transmission line according to the specifications in the Easement, the right to remove "brush, trees and overhanging branches … on or over the [Easement property]," the right to "cut down and remove" dead or dying trees that might interfere with the transmission line, and the right to "[e]nter the [Easement property] for the purposes of fully exercising and enjoying the rights conferred." When read in context, this part of the clause simply means that JT Properties' use of the buildings located on the Easement property cannot interfere with the specific rights granted to ATC by the Easement.

¶32 The second part of this clause—"the terms and conditions applicable to the Landowner's use of the [Easement property]"—refers to specified limitations on JT Properties' use of the Easement property without obtaining ATC's prior consent. For example, the Easement provides that, unless JT Properties has secured ATC's prior written consent, JT Properties may not engage in certain modifications to the Easement property, including "enlarg[ing] or improv[ing] [existing] buildings and signs," "install[ing] any appendages that will cause [ATC's] facilities to be in violation of any applicable laws, rules, or regulations," or "perform[ing] any work on the buildings and signs within the [Easement property] other than normal maintenance." When read in context, this part of the clause refers to the specific limitations placed on JT Properties in

modifying the land and structures within the Easement property without securing the prior written consent of ATC. This language does not grant ATC the right to remove the existing buildings on the Easement property.

¶33 Finally on this issue, as discussed above, we interpret the Easement as requiring that ATC hang the electrical wires 20.7 feet above the highest point on the Easement property. This means that the Easement does not allow ATC to hang wires at 20.7 feet above the lowest point in the Easement property—*i.e.*, the surface of the graded portion of the Easement property. As a result, ATC cannot effectively force JT Properties to remove the existing buildings by hanging the wires at a height at which the wires come close to or in contact with the buildings.

¶34 In sum on this issue, we conclude that the Easement, when read in its entirety, does not grant ATC the right to remove the existing buildings on the Easement property. As the dominant estate holder, ATC is not allowed to use the Easement property beyond the uses that are specifically granted by the Easement. *See Garza*, 374 Wis. 2d 555, ¶23 ("The dominant estate holder's 'use of the easement must be in accordance with and confined to the terms and purposes of the grant.' Any use not in accordance with the specific right to use granted in the easement is outside the easement's scope and thus prohibited." (citations omitted)). Therefore, the circuit court did not err in rejecting JT Properties' uneconomic remnant claim by failing to consider the possibility that JT Properties could be required to remove the buildings on the Easement property.

## D. Entry into the Existing Buildings

¶35 JT Properties argues that the circuit court failed to consider that the Easement grants ATC the right to enter the buildings within the Easement property. In support, JT Properties relies on the portion of the Easement that

grants ATC the right to construct a transmission line "upon, in, over and across property owned by the Landowner" as well as a separate portion of the Easement that grants ATC the right to "[e]nter upon the [Easement] for the purposes of fully exercising and enjoying the rights conferred" by the Easement. JT Properties also observes that ATC has previously carved out the footprint of existing buildings in the language of other transmission line easements, but that it did not do so here. For the following reasons, we conclude that the Easement does not grant ATC the right to enter the existing buildings on the Easement property.

¶36 Under Wisconsin law, the rights granted by an easement are not governed solely by the terms of the easement, but also by the purpose of the easement. *Id.*, ¶39 (citing *Hunter v. McDonald*, 78 Wis. 2d 338, 343, 254 N.W.2d 282 (1977)). This court has explained:

> We do not read the law to say that a broad grant of an access easement means that all accommodations which serve the purpose of the easement must be allowed. Rather, … *the easement must be interpreted so as to accomplish its purpose bearing in mind the reasonable convenience of both parties.* Once this purpose is served, further expansion of the easement is neither necessary nor warranted.

*Atkinson v. Mentzel*, 211 Wis. 2d 628, 645-46, 566 N.W.2d 158 (Ct. App. 1997) (citation omitted; emphasis added). In other words, even if an easement contains a broad grant of rights, we must interpret that broad grant of rights in a way that does not exceed the purpose of the easement.

¶37 Assuming without deciding that the language on which JT Properties relies could be reasonably interpreted as allowing ATC to enter the existing buildings on the Easement property, we conclude that such entry would not be consistent with the purpose of the Easement. The parties do not dispute that the

purpose of the Easement is to allow ATC to construct and maintain a transmission line for transmitting electricity across the Easement property. *See Garza*, 374 Wis. 2d 555, ¶39 (determining that the purpose of the transmission line easement in that case was to "transmit electricity"). JT Properties does not provide any evidence that ATC's entry into the existing buildings would accomplish the purpose of transmitting electricity. ATC's real estate manager confirmed in testimony at trial that "[t]here's no reason for ATC to go inside any of the buildings because all the transmission facilities are located outside of the buildings." For these reasons, we do not interpret the Easement as authorizing ATC to enter the buildings on the Easement property. *Cf. id.*, ¶40 (concluding that the utility's replacement of wood power poles with steel power poles was consistent with the purpose of transmitting electricity). Therefore, we conclude that the circuit court did not err in not considering the possibility that ATC could enter the buildings on the Easement property when determining that the taking did not create an uneconomic remnant.

## II. Necessity

¶38 As noted, JT Properties argues in the alternative that the jurisdictional offer is void because the taking exceeded what was needed for the public purpose of providing electricity. "[T]he necessity, expediency, or propriety of exercising the power of eminent domain, and the extent and manner of its exercise, are questions of general policy, and belong to the legislative department of the government." *Falkner v. Northern States Power Co.*, 75 Wis. 2d 116, 131, 248 N.W.2d 885 (1977) (citation omitted). In the present case, the legislature has delegated its eminent domain authority to ATC. *See* WIS. STAT. § 32.02(5)(b). In this context, a taking is necessary if it is "reasonably requisite and proper for the accomplishment of the public purpose for which the property is sought." *Falkner*,

75 Wis. 2d at 132. If the taking of property is not necessary to accomplish the public purpose, then the jurisdictional offer is invalid. *Mitton v. DOT*, 184 Wis. 2d 738, 745-48, 516 N.W.2d 709 (1994). The necessity of a taking may be reviewed in a right-to-take action under WIS. STAT. § 32.06(5). *Falkner*, 75 Wis. 2d at 132.

¶39     Here, JT Properties argues that the jurisdictional offer is void because ATC took more rights than it needed to accomplish the purpose of the taking. JT Properties does not dispute that it was necessary for ATC to construct a transmission line on the Property generally. Rather, JT Properties contends that ATC did not need to take the right to perform two specific actions: (1) hanging electrical wires 20.7 feet above the graded portion of the Easement property; and (2) entering the buildings on the Easement property. This argument fails because, as previously discussed, we do not interpret the Easement as granting either of these rights to ATC. Therefore, the jurisdictional offer is not void for lack of necessity.

## CONCLUSION

¶40     For the foregoing reasons, the judgment of the circuit court is affirmed.

*By the Court.*—Judgment affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.

21